UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
BARBARA DROUTMAN,

                        Plaintiff,            **MEMORANDUM & ORDER**
                                          03-CV-5384 (DRH) (ARL)

       - against -

NEW YORK BLOOD CENTER, INC.

                        Defendants.
----------------------------------------------------------X
**A P P E A R A N C E S :**

**ZABELL & ASSOCIATES, LLP**
Attorneys for Plaintiff
500 Bi-County Boulevard, Suite 112 N
Farmingdale, New York  11735
By:  Saul D. Zabell, Esq.

**HUGHES HUBBARD & REED LLP**
Attorneys for Defendant
One Battery Park Plaza
New York, New York  10004
By:  Robb W. Patryk, Esq., Jason Habinsky, Esq.


**HURLEY, District Judge:**


*INTRODUCTION*

        Plaintiff Barbara Droutman filed the present Americans With Disabilities Act

and New York State Human Rights Law action against her former employer, Defendant New

York Blood Center ("NYBC"), claiming discriminatory termination based on her asthma.

NYBC has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For

the reasons that follow, NYBC's motion is granted and this case is dismissed in its entirety.

## BACKGROUND[1]

NYBC is a non-profit organization located in Westbury, New York, that collects blood from volunteer donors. Droutman began her employment at NYBC as a temporary worker in January 2000, and was given a permanent position there in May 2000.

At all times relevant to this motion, Droutman worked as a "Payroll Coordinator" or "Secretary of the Collections Department," and reported to Andrew Martin, NYBC's Director of Operations, and Dianne Marullo, a "Team Leader." Her primary responsibility was to be the "time keeper" for her Department. As such, Droutman retrieved time sheets or "Time Reports" from other employees. The time reports indicated the number of hours each employee worked per day. Droutman inputted the reported hours into electronic spread sheets, submitted the spread sheets to Martin for review, and then submitted them to the Payroll Department.

As "time keeper," Droutman was also responsible for maintaining "Time Cards" for each employee, which were annual calendars designating each day that the employee was absent from or late to work, and the reason given. Management-approved vacation or personal days were marked "P," sick days were marked "S," and according to Droutman, "emergency personal days" were marked "EP." According to NYBC, "[o]ne of the purposes of the Time

---

[1] The facts contained herein are undisputed unless otherwise indicated, and are taken primarily from NYBC's Local Rule 56.1 Statement, Droutman's Rule 56.1 Counter-statement, and the parties' memoranda.

Cards is to reveal patterns of suspect or inexcusable absences and lateness by employees," such as "that an employee frequently takes sick days on Fridays and Mondays." NYBC further states that "[i]t was one of Ms. Droutman's responsibilities to look for these patterns and other suspect information in employees' time records." The parties agree that on one occasion Droutman discovered and reported that Christine Gray, another NYBC employee, "went out for lunch . . . and then came back and said that she did not take lunch"; Gray was subsequently suspended, although Droutman notes that this occurred "months later."

Marullo officially reviewed Droutman's job performance both in November 2000 and in October 2001, and on both occasions gave her favorable evaluations. But on June 19, 2002 Martin and Marullo met with Droutman to "discuss issues regarding her job performance," including that she was "not completing assignments," "the assignments that she was completing were not correct," and that "she was spending too much time in the workplace chitchatting with other people." Most importantly, Martin and Marullo informed Droutman that they had discovered that her 2002 Time Card was "completely and utterly blank" for that year to date, "while the other 180 employees' cards were completed within a week's accuracy," that "as the time keeper for the department, it looks HIGHLY suspect that the only incomplete time card is hers," that "a blank attendance card is, in effect, falsification by omission," and that "NYBC had terminated other employees for similar conduct."[2]

---

[2]     In contrast to Martin's deposition statements clearly recalling that he warned Droutman during their June 19, 2002 meeting, Droutman insisted at her deposition that "she did not recall meeting with Andrew Martin on June 19, 2002," and that "she did not [recall] Martin or Marullo telling her it was highly suspect that her timecard was incomplete." But a "[plaintiff's] failure of recollection does

Droutman subsequently asked to take off Monday, July 29 through Friday, August 2, 2002 as vacation days. Because Marullo was scheduled to be on vacation on July 29th, she denied Droutman's request to take that day off, but approved the rest of the week for Droutman's vacation. Droutman did not come to work on July 29th. According to NYBC, she "called in sick" that morning; according to Droutman, she "called in an Emergency Personal Day" because she "was unable to get to work because she was in Massachusetts with her husband who was ill." But the parties do not dispute that Droutman's time sheet, time card, and the Time Report were all subsequently marked, inaccurately, with a "P" for July 29th, suggesting that she had taken an approved vacation or personal day.

According to Droutman, the employee sign-in sheet "was kept in the middle of a room shared by Plaintiff [and several others including] Christine Gray," "[a]ll of the employees had access to [it]," and "[i]f an employee was out on vacation anyone of the other employees would mark the sign-in sheet to indicate that," or "if an employee called in sick anyone of the other employees would indicate that." Droutman notes that the sign-in sheet "was sometimes altered." Droutman says that although she called in an "Emergency Personal Day" on July 29, the employee sign-in sheet "was noted incorrectly," because Gray "told Diane Marullo that she had taken Plaintiff's phone call and that Plaintiff had called in sick." Further, states Droutman, "Marullo was Plaintiff's backup and would take over payroll when Plaintiff was out," Marullo "returned from her vacation on Tuesday, July 30, 2002," and upon her return,

_____

not suffice to raise an issue of fact in the face of [the defendant's] clear recollection." *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp.2d 384, 389 (S.D.N.Y. 2000).

Marullo inputted the information on the July 29 sign-in sheet as it was written.

According to NYBC, however, Droutman inputted her own (inaccurate) time report into the system. Marullo testified that upon her return on July 30 she only inputted the phlebotomy staff's sign-in sheets, and that "[w]e always do the office staff [of which Droutman was a member] a week after." Martin discovered the discrepancy in Droutman's time records on August 23, 2002, and "determined that this was an attempt by Ms. Droutman to hide the fact that she had called in sick on the day that she had not been allowed to take as a vacation day," because she "knew that if [he] looked at her [time records] and saw sick on Monday and then she had four vacation days, [he] would . . . counsel her on that." According to NYBC, on that same day Martin decided to fire Droutman for falsification of documentation, effective August 26, 2002 (the next business day). At approximately 4:15 or 4:30 on August 26, Martin and another NYBC manager met with Droutman and informed her that she was terminated.

During Droutman's time at NYBC, its facility was under construction, and dust from the construction work apparently caused her to develop asthma. Droutman claims to have suffered approximately ten asthma attacks between October 5, 2001 and August 13, 2002, which she mitigated through the use of a prescribed inhaler, breathing exercises, and movement to fresh air. According to Droutman, during her asthma attacks she experienced "a feeling of tightness in my neck and chest and being unable to speak and breathe." Droutman apparently did not go to the hospital or seek immediate medical attention, although on one occasion co-workers called her husband "to come and take her home from work because of her difficulty breathing." Droutman's attacks occurred only at work, not at home. Her supervisors were

aware of the attacks, and moved her work station "many times" in an attempt to lessen her exposure to the construction dust. NYBC also installed a "very large independent air filter" close to Droutman's desk. However, Droutman apparently continued to experience asthma-related symptoms.

On the afternoon of August 26, 2002, "in order to obtain reimbursement for the cost of her prescription asthma medication," Droutman submitted a faxed note from her pulmonologist to NYBC's Human Resources Department. The note stated in full:

August 26, 2002

RE:     DROUTMAN, Barbara

To whom it may concern:

Barbara Droutman has been under my care since 3/27/02 for asthma. Her condition was brought on by exposure to ongoing construction at her place of work. Use of an air purifier in her work area brought about some improvement in her symptoms, however, she still suffered from asthma attacks.

Relocation to an area outside the construction zone has resulted in further improvement, although her symptoms do persist.

Sincerely,
Jason Karp, M.D.

Shortly after submitting this note, Droutman was informed of her termination. She asserts that NYBC replaced her with "someone who does not have asthma and is not disabled."

*DISCUSSION*

I.     *Summary Judgment*: *Legal Standards*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that

affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The

summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

II.     *Droutman's Americans With Disabilities Act Claim Must Fail.*

      A.     *The ADA and McDonnell Douglas: Legal Standards*

The Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., states in pertinent part: "No [employer covered by the Act] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Where, as here, there is no *direct* evidence of an employer's alleged disability-based discrimination, courts analyze ADA claims under the same framework as other federal employment discrimination claims, first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002). Under the *McDonnell-Douglas* standard, (1) a plaintiff

must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason for its actions is merely pretextual, and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intentional evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

      B.     *Droutman fails to state a prima facie case of disability discrimination.*

NYBC's first argument is that Droutman fails to even state a prima facie case of disability discrimination. To state a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that her employer is subject to the ADA, that she suffers from a disability within the meaning of the ADA, that she could perform the essential functions of her job with reasonable accommodation of her disability, and that she was fired under circumstances giving rise to an inference of discrimination. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998); *and Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). At the summary judgment stage, the burden of demonstrating a prima facie case of employment discrimination under the ADA and *McDonnell Douglas* is "de minimis." *See Estwick v. U.S. Air Shuttle*, 950 F. Supp. 493, 502

(E.D.N.Y. 1996) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Droutman bases her "inference of discrimination" primarily on the fact that she was fired on the same day that she submitted a doctor's letter noting the persistence of her asthma. The temporal proximity of an employee's disclosure of a disability and her termination helps support an inference of disability discrimination. *See Bullock v. Balis & Co., Inc.*, No. 99 Civ. 748, 2001 WL 253857, at *4 (E.D. Pa. March 14, 2001). Nevertheless, NYBC argues convincingly that Droutman has not established that she is "disabled," and that she has thus failed to state a prima facie case.[3]

    1.    *Droutman fails to show that she is "disabled" under the ADA.*

The ADA defines "disability" as (A) a physical or mental impairment that *substantially limits* one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being *regarded as having* such an impairment. 42 U.S.C. § 12102(2) (emphases added). Regulations promulgated under the ADA define "major life

---

[3]    NYBC also argues that Droutman's purported prima facie case is disproved in part by the fact that NYBC went out of its way to *accommodate* her asthma, by repeatedly moving her desk and installing an air filter where she worked. It does seem rather unlikely that NYBC, after almost eleven months of attempting to help Droutman, reversed its attitude within the space of (by her own reckoning) forty-five minutes of receiving Dr. Karp's letter. *See Moskerc v. Am. Airlines, Inc.*, No. 02 Civ. 710, 2004 WL 1354521, at *5 (N.D. Ill. May 11, 2004) (assisting employee in search for less taxing jobs and restricting weight-lifting requirements of employee's original position in response to ergonomist's report are "hardly the actions of an employer that deems an employee as unable to work because of a substantial limitation on a major life activity"). Because Droutman's claim clearly fails for other reasons, however, this issue need not be resolved.

activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working*." 29 C.F.R. § 1630.2(i) (1997) (emphasis added).

"Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998). The term "substantially limits" has been held to mean "significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity." *Hendler v. Intelecom USA, Inc.*, 963 F. Supp. 200, 206 (2d Cir. 1997). In assessing whether a plaintiff is "disabled," courts "have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities." *Ryan*, 135 F.3d at 870.

Thus, while asthma is certainly an "impairment," it cannot constitute a "disability" under the ADA unless it *substantially limits* or *significantly restricts* the sufferer's ability to perform a major life activity — in this case, work. *See Nugent v. Rogosin Inst.*, 105 F. Supp.2d 106, 112 (E.D.N.Y. 2000). "Numerous [courts have] held that an asthmatic condition which only prevents plaintiff from working at one job, or a narrow category of jobs, is not a qualifying disability under the ADA." *Id.* (citing *Muller v. Costello*, 187 F.3d 298, 302-06 (2d Cir. 1999), as well as cases from Fourth and Eighth Circuits).

Furthermore, in determining whether a plaintiff is disabled, a court must

consider "measures that mitigate the individual's impairment." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999). In a case involving asthma, the court should thus "consider the extent to which plaintiff is able to control his asthmatic symptoms," through the use of corrective measures such as inhalers or other medications. *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 273 F. Supp.2d 292, 315-16 (W.D.N.Y. 2003) (citing, 187 F.3d at 313).

In the present case, Droutman's asthma clearly did not "substantially limit" her major life functions, particularly her work: Droutman's ten or so asthma attacks were apparently limited to her working environment, self-medicated with an inhaler, and mitigated by breathing exercises and movement to an area of fresh air; Droutman was also generally capable of performing her job assignments. Droutman thus did not have a "disability" as defined by the ADA, and appears to concede this point.

    2.    *Drautman also fails to show that she was "regarded as disabled" under the ADA.*

Droutman argues that, although not actually suffering from an impairment that substantially limited her major life functions, she still qualifies as disabled under the ADA, because NYBC "regarded her" as being disabled. Droutman's argument falls short.

As suggested above, even an employee who does not actually suffer from an impairment substantially limiting one or more major life activities may still be considered "disabled" for ADA purposes, if she demonstrates that she was "regarded as having such an impairment" by her employer — even erroneously. *See Sutton*, 527 U.S. at 489 (citing 42

-13-

U.S.C. § 12102(2)(C)).  The EEOC's regulations elaborate that "regarded as having such an impairment" includes "[having] a physical or mental impairment that does not substantially limit a major life activity but is treated by a covered entity as constituting such limitation."  29 C.F.R. § 1630.2(l).

A plaintiff proceeding on a "regarded as" theory of disability faces a "particularly heavy burden."  *Peeples v. Coastal Office Prods., Inc.*, 203 F. Supp.2d 432, 460 (D. Md. 2002).  The Sixth Circuit has explained that this type of claim "takes a plaintiff to the farthest reaches of the ADA.  It is a question embedded almost entirely in the employer's subjective state of mind.  Thus, proving the case becomes extraordinarily difficult."  *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001).

The fact that an employer is *aware of* an employee's impairment, without more, is insufficient to demonstrate either that the employer "regarded the employee as disabled" under the meaning of the ADA, or that that perception led to an adverse employment action.  *Cavallaro v. Corning, Inc.*, 93 F. Supp.2d 334, 345 (W.D.N.Y. 2000) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996)).  Rather, the plaintiff must show "that her employer erroneously believed that she was substantially limited in her ability to work," or "mistakenly believed that she was substantially limited in other major life activities, such as breathing."  *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 273 F. Supp.2d 292, 320 n.24 (W.D.N.Y. 2003) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001)).

The only evidence Droutman offers to show that NYBC regarded her as disabled is the doctor's letter that she presented to NYBC's human resources department on the day of

her termination. As noted, this letter stated states only that Droutman has been treated for asthma "brought on by exposure to ongoing construction," that "[u]se of an air purifier in her work area brought about some improvement in her symptoms," that "[r]elocation to an area outside the construction zone has resulted in further improvement," but that "her symptoms do persist." Droutman posits that "Martin [could have] wrongly believed Plaintiff was completely unable to work after receiving Dr. Karp's note." But nowhere does the doctor's note suggest that Droutman was utterly incapable of working in other facilities or performing any other basic life functions, and she points to no other evidence remotely tending to suggest that NYBC regarded her as such. A doctor's note of this sort, without more, cannot support Droutman's claim of "regarded as disabled" discrimination. *See*, *e.g.*, *Moskerc v. Am. Airlines, Inc.*, No. 02 Civ. 710, 2004 WL 1354521, at *5 (N.D. Ill. May 11, 2004) (plaintiff "cannot simply rely upon the restrictions listed in his doctor's note to support his 'regarded as' claim"); *Christner v. Am. Eagle Airlines, Inc.*, No. 02 Civ. 0211, 2003 WL 21267105, at *6 (N.D. Ill. May 30, 2003) ("disability certificates" from employee's doctor indicating that he was unable to perform his job were "too vague" to indicate whether employer regarded him as disabled); *and Hawana v. City of New York*, 230 F. Supp.2d 518, 531-32 & 532 n.5 (S.D.N.Y. 2002) (doctors' notes diagnosing plaintiff with major depression but not indicating that condition seriously impaired his ability to perform major life activity do not constitute evidence that defendant regarded him as disabled).

      C.     *NYBC has offered a legitimate, non-discriminatory explanation for Droutman's termination.*

Even assuming that Droutman has managed to state a prima facie case of disability discrimination under the ADA (in light of her de minimis burden), NYBC has easily met its burden of articulating a non-discriminatory reason for terminating her. An employer's burden of showing a legitimate non-discriminatory reason for its actions is not particularly onerous. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985).

As NYBC suggests, an employee's falsification of her time sheets, reported hours, or attendance records is an undeniably legitimate and non-discriminatory reason for terminating her. *See*, *e.g.*, *Costello v. St. Francis Hosp.*, 258 F. Supp.2d 144, 155 (E.D.N.Y. 2003) ("falsification of a time sheet can constitute a legitimate, nondiscriminatory reason for terminating an employee"); *Sanyer v. Kimberly Quality Care*, 971 F. Supp. 86, 89 (E.D.N.Y. 1997) (employee's lateness, submission of an inaccurate time sheet, failure to seek authorization to leave early, and failure to notify supervisor regarding absences are legitimate, non-discriminatory reasons for her discharge); *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (employee's falsification of time records and other misconduct were legitimate and nondiscriminatory reasons for her termination).

In the present case, having previously warned Droutman about her "highly suspect" blank time card and other job performance issues, NYBC asserts that it fired her after discovering what it felt was "falsification of documentation." This is an undeniably legitimate

and non-discriminatory rationale for Droutman's termination.

> D. *Droutman fails to demonstrate that NYBC's proferred reasons for firing her were pretexts for discrimination.*

As noted previously, once an allegedly discriminatory employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and that more likely than not discrimination motivated the adverse employment action. An employment discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F. Supp.2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)). However, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight" if she is to withstand summary judgment. *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). In this case, Droutman has failed to do so.

Although Droutman's briefing is hardly a model of clarity, it appears to claim pretext behind NYBC's stated reasons for her termination based on the following: (1) that Martin claimed to review time cards every three months, but discovered Droutman's blank 2002 time sheet only in June; (2) that NYBC claims to have warned Droutman upon

discovering her blank time card that falsification by omission had been grounds for terminating other employees in the past, but had actually only told her that "affirmative misrepresentation" was grounds for termination, and had not actually terminated Christine Gray, or any "other employees" for falsification of time records; (3) that Droutman did not actually call in sick on July 29, 2002, but instead called in an "Emergency Personal Day" because she was stuck in Massachusetts with her husband, who was ill, and that this call was taken and misreported by Gray; and (4) that Marullo, standing in for Droutman, had been responsible for entering the time records during the remainder of Droutman's time away from work.   Fairly read, these points seem to boil down to two basic arguments for pretext:  first, that Droutman did not falsify her July 29, 2002 time information; and second, that other allegedly dishonest (but not "disabled") employees were treated more leniently than her for similar infractions.    Both arguments fail to demonstrate pretext.

1.    *Even if Droutman did not actually falsify her attendance records, she fails to show that NYBC's belief that she did is pretextual.*

Droutman argues that she took a legitimate "Emergency Personal Day" and did not falsify her attendance record, and seems to suggest that someone else (accidentally or purposely) altered her time card or time sheet to make it look as though she  had misreported her attendance.   Even assuming that all of the above is actually true, that does not suffice to demonstrate pretext under the *McDonnell Douglas* standard.

Absent discrimination, an employer may fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all." *Mohamed v. Marriott*

*Int'l, Inc.*, 905 F. Supp. 141, 155 (S.D.N.Y. 1995) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)).   An employer's good faith *belief* that an employee engaged in misconduct is a legitimate reason for terminating her, and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination.   *See Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 747 & n.5 (S.D.N.Y. 1996) (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993), *and Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).   Thus, even assuming a factual issue regarding whether an employee engaged in the misconduct for which her employer claims she was fired, and even assuming that she did not in fact engage in the misconduct, where the employer presents evidence showing that it *believed* that she had engaged in the misconduct and based its decision to terminate her on that belief, the employer's error does not constitute pretext.   *Id.*

In the present case, Droutman seems to surmise that Gray misreported Droutman's reason for being absent on July 29, 2002, that Marullo then entered the incorrect information onto Droutman's time report or time card, and that Martin then seized upon this discrepancy as an excuse to fire Droutman as soon as he saw her doctor's note.   Droutman also repeatedly "avers that Martin's proffered reasons for terminating her employment were pretextual," and "avers that Defendant terminated her because of her disability or perceived disability."   Such unsupported conjecture and conclusory statements obviously do not suffice to meet Droutman's burden of demonstrating pretext, and Droutman has offered no evidence whatsoever indicating that Martin, who actually made the decision to terminate her, did not

believe that Droutman had falsified her time card.

     2.    *Droutman fails to show that she was treated differently than other similarly situated employees.*

Droutman appears to see pretext in that only she, and not Christine Gray or any other employee was terminated for falsification of time records. As Droutman suggests, the *dissimilar* punishment of similar employees committing similar disciplinary infractions, if correlated with race, sex, or some other protected classification, *can* indicate pretext behind the employer's stated reasons for the punishment. *See, e.g., Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 342 (7th Cir. 2001) (finding employer's stated non-discriminatory reason for suspending female employee — namely falsified time sheet — pretextual, given lack of disciplinary action taken against male employees in similar incidents).

But "[e]mployees are not 'similarly situated' merely because their conduct might be analogized"; rather, the employees "must have reported to the same supervisor . . . , been subject to the same standards governing performance evaluation and discipline, and must have engaged in [similar] conduct . . . , without such . . . circumstances that would distinguish their conduct or the appropriate discipline for it." *Mazzella v. RCA Global Communications, Inc.*, 642 F. Supp. 1531, 1547 (S.D.N.Y 1986); *see also Mustafa v. Park Lane Hotel, Inc.*, 12 F. Supp.2d 360, 363 n.6 (S.D.N.Y. 1998) (no pretext behind termination of plaintiff but not plaintiff's co-worker, as plaintiff had different job description than co-worker and had engaged in more serious conduct than co-worker; plaintiff was "not a similarly situated employee" and

was properly "held to a higher standard"). And it is the plaintiff's burden to demonstrate her similar situation. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002); *see also Francis v. Runyon*, 928 F. Supp. 195, 203 (E.D.N.Y. 1996) ("Plaintiff must also establish that the other employee's acts were of 'comparable seriousness' to her own infraction.") (quoting *Linear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir. 1988)). Where there are clear differences between the employees' positions, infractions, or punishments, summary judgment may be appropriate. *See Curry v. Menard, Inc.*, 270 F.3d 473, 480 (7th Cir. 2001).

In the present case, the evidence clearly shows that Droutman and Gray were *not* similarly situated employees, and that they did *not* commit similar infractions. Droutman, by her own admission, was responsible for the other employees' time sheets and time cards. It was thus eminently reasonable for NYBC to hold her to a higher standard of ethics and competence in reporting or entering her own hours and days worked. *See Hoover v. U.S.*, 513 F.2d 603, 607 (Ct. Cl. 1975) (severe punishment for tax technician's tax fraud justified, since he "did exactly what was his duty to prevent").

Moreover, while Martin and Marullo warned Droutman regarding her time card omissions or falsifications prior to her sick day episode on July 29, 2002,[4] she offers no

---

[4]    Droutman also suggests that she had not been fairly warned that conduct similar to her alleged "falsification by omission" was grounds for termination, because NYBC had only "discussed that Gray's affirmative misrepresentation was ground for termination." Even assuming that this is a legitimate distinction, it is irrelevant, since NYBC terminated Droutman for her alleged affirmative misrepresentation, not any omission.

indication that Gray had similarly been previously warned before her lunch hour falsification episode. Thus, the fact that Gray was not terminated for the latter incident does not indicate dissimilar treatment. *See Peters*, 307 F.3d at 546-47 (plaintiff failed to meet burden of identifying similarly situated individuals treated more favorably than he; plaintiff listed other employees who allegedly falsified "activity logs" but were not disciplined, but plaintiff failed to name any co-worker who, like he, had previously been warned about such infractions).

   In sum, Droutman fails to demonstrate that NYBC treated other employees, who were *actually* similarly situated to her, differently. For this reason as well, she fails to demonstrate that NYBC's proffered reason for her termination is pretextual.

III. *Droutman's New York Human Rights Law Claim Must Fail.*

   As mentioned previously, Droutman's complaint also claims that NYBC violated the New York Human Rights Law (NYHRL or NYSHRL), which provides in pertinent part: "It shall be an unlawful discriminatory practice: (a) For an employer . . . , because of the . . . disability . . . of any individual . . . to discharge from employment such individual." N.Y. Exec. Law § 296. This claim too, must fail.

   "For the most part, the ADA and the NYSHRL are construed similarly, and the clear legislative purpose in drafting the NYSHRL was 'to enact a definition of disability coextensive with comparable federal statutes.' " *Burton v. Metro. Transp. Auth.*, 244 F. Supp.2d 252, 257 (S.D.N.Y. 2003) (quoting *Reeves v. Johnson Controls World Servs.*, Inc., 140 F.3d 144, 155 (2d Cir. 1998)). And absent direct proof of discrimination, summary

judgment motions under the NYHRL are analyzed under the same *McDonnell Douglas* burden-shifting framework as ADA claims, discussed *supra* at Part II.A.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000).

Since it has already been determined in the ADA context that Droutman fails to demonstrate pretext behind NYBC's legitimate reasons for terminating her, *see* Parts II.B and II.C, *supra*, Droutman's NYHRL claim necessarily fails as well.[5]

*CONCLUSION*

For all of the above reasons, the Defendant's motion for summary judgment is GRANTED as to all of the Plaintiff's claims, and this case is accordingly DISMISSED in its entirety.  The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated:        July 27, 2005
              Central Islip, New York           /s/_____
                                                Denis R. Hurley
                                                United States District Judge

---

[5]        The NYHRL does define "disability" more broadly than the ADA; under the NYHRL, " 'if [an individual's] impairment is demonstrable by medically accepted techniques[,] it is not required that the impairment substantially limit that individual's normal activities.' " *See Burton*, 244 F. Supp.2d at 257-58 (citing N.Y. Exec. Law § 292(21); *Reeves*, 140 F.3d at 155; *and State Div. of Human Rights v. Xerox Corp.*, 480 N.E.2d 695, 698 (N.Y. 1985).  However, this distinction is presently irrelevant, since Droutman fails to demonstrate that NYBC's legitimate non-discriminatory reason for terminating her is pretextual. *Cf. Clark v. New York State Elec. & Gas Corp.*, 67 F. Supp.2d 63, 73 n.8, 73-74 (N.D.N.Y. 1999).